[Civil No. 4097. Filed December 18, 1939.]

[97 Pac. (2d) 210.]

CITY OF PHOENIX, a Municipal Corporation, and M. L. WHEELER, City Manager of the City of Phoenix, a Municipal Corporation, Appellants, v. GEORGE KASUN AND MARY KASUN, his Wife, on Behalf of Themselves and All Others Similarly Situated, Appellees.

Mr. Hess Seaman, City Attorney, and Mr. William C. Fields, Assistant City Attorney, for Appellants.

Mr. E. O. Phlegar and Messrs. Cunningham & Carson, for Appellees.

LOCKWOOD, J.—This is an action by George Kasun and Mary Kasun, his wife, hereinafter called plaintiffs, on behalf of themselves and others similarly situated, under section 3736, Revised Code of 1928,

against the City of Phoenix, a municipal corporation, hereinafter called defendant, asking for an injunction against the latter's attempting to enforce a certain ordinance adopted by it increasing the water rates to be paid by consumers outside of the city limits. The substance of the complaint was that the ordinance raising the rate was void because the amount charged for service to the outside consumers was exorbitant, excessive, oppressive, unreasonable and confiscatory. Upon the filing of the complaint an order to show cause was issued to the defendant. In response to such order, it filed a motion to dismiss plaintiffs' complaint upon the grounds, among others, that it appeared upon the face thereof that the court had no jurisdiction of the subject matter. Defendant further filed a verified answer denying all the material allegations of the complaint, and setting up as a special defense that the water furnished to plaintiffs was furnished under a contract which permitted the raising of the rates to be charged to consumers of plaintiffs' class at any time by the city, and that such being the case, the court was without jurisdiction to review the terms of the contract on the ground that the rate fixed by the city was exorbitant, unreasonable or discriminatory. At the hearing on the order to show cause, the court overruled defendant's motion to dismiss the complaint and entered an order for a temporary injunction prohibiting the collection of rates under the ordinance in question. Subsequent to the issuance of such temporary writ of injunction, the city adopted another ordinance, No. 2822, repealing all previous ordinances, and fixing the rate to be paid for water delivered to consumers, including all consumers both within and without the city limits. A supplement to the original complaint was filed, alleging that the new ordinance was void for the same reasons as the one

first complained of, and asking for a temporary injunction against it. Defendant objected for the same reason it had to the original complaint, and then stipulated as follows:

"Whereas, if and in the event the Court denies defendants' motion to dismiss supplemental complaint in resistance to motion for order extending or clarifying temporary injunction and to quash temporary injunction heretofore granted herein, the defendants desire to appeal from said temporary injunction as extended or clarified in advance of a trial on the merits on the issues raised by the pleadings herein,

"It is stipulated and agreed between the parties hereto as follows:

"1. That the trial setting heretofore entered be vacated and that said case not be set for trial pending such appeal and its determination;

"2. That pending such appeal and its determination, the City of Phoenix will bill all non-resident water consumers at the rates in force before the enactment of the ordinances sought to be invalidated in plaintiffs' original complaint, and in the event defendants are successful on said appeal, no attempt to retroactively enforce said ordinances sought to be invalidated in said original and supplemental complaint will be made by the City."

The injunction as asked for in the supplemental complaint was then granted, and the following stipulation was made:

". . . and Counsel for the defendants having stipulated in open court that if the Court, as a matter of law, has jurisdiction to determine whether or not said water rates as fixed in said ordinance No. 2822 are unreasonable, arbitrary or discriminatory, that the complaint and supplemental complaint contain allegations sufficient to warrant the Court in granting a Temporary Restraining Order until this cause may be heard upon its merits, the Court finds that the plaintiffs are entitled to a Temporary Injunction against the defendants, restraining, inhibiting and enjoining

the said defendants from enforcing or attempting to enforce the provisions of Ordinance No. 2822. . . . ''

It was the theory of plaintiffs that the court had jurisdiction to consider this question. It was contended by defendant that the relationship between the city and consumers of water beyond its corporate limit was not one of public duty, but of voluntary contract, which the court had no jurisdiction to review on the ground that it was unreasonable, arbitrary or discriminatory. The issue of jurisdiction is the sole one for our determination.

We have previously laid down certain rules governing municipal corporations operating public utilities, both within and without their corporate limits. They may be stated as follows: (a) a municipal corporation has a right to furnish water through its municipal water plant to consumers without, as well as within, its corporate limits; (b) while furnishing water in this manner the state corporation commission has no jurisdiction to regulate its actions towards consumers, whether inside or outside of such limits; (c) the legislature is the only body which has the right to regulate the rates charged by a municipal corporation operating a public utility, and it has plenary power in that respect except as limited by the Constitution; (d) a municipality may not compel consumers outside of its corporate limits to purchase water from it, nor can it be compelled to furnish such water to non-residents; (e) a municipality can only dispose of its surplus water outside of its corporate limits subject to the prior right of its inhabitants in case of shortage. We think these propositions are either declared specifically or impliedly by the cases of *City of Phoenix* v. *Wright,* 52 Ariz. 227, 80 Pac. (2d) 390; *Crandall* v. *Town of Safford,* 47 Ariz. 402, 56 Pac. (2d) 660; *City of Tucson* v. *Sims,* 39 Ariz. 168,

4 Pac. (2d) 673; *Menderson* v. *City of Phoenix*, 51 Ariz. 280, 76 Pac. (2d) 321.

But, it is contended, admitting all of this to be true, the courts have the inherent right to determine the reasonableness of charges made by a municipality, so long as it does furnish water outside of its limits. This is urged upon the basis that the municipality, when it undertakes this, is operating a public utility, and that public utilities are always subject to the jurisdiction of the courts as to whether their rates are unjust, arbitrary or confiscatory.

The distinguishing characteristic of a public utility is the devotion of private property by the owner to such a use that the public generally, or at least that part of the public which has been served and has accepted the service, has the right to demand that such service, so long as it is continued, shall be conducted with reasonable efficiency and under proper charges. When private property is thus devoted to the public use, certain reciprocal rights and duties are raised by implication of law as between the utility and the persons whom it serves, and no contract is necessary to give them. Inasmuch, therefore, as one who devotes his property to a use in which the public has an interest, in effect grants to the public an interest in the use thereof, he must submit to being controlled by the public for the common good to the extent of the interest thus created and so long as such use is continued. *Munn* v. *Illinois*, 94 U. S. 113, 24 L. Ed. 77. The right inherent in the public authorities to control the rates to be charged by those operating public utilities is based on the fact that they owe a legal duty to the public to furnish certain services and can, therefore, be regulated by the public as to the price to be charged for such services. It is upon these basic principles that the entire superstructure of public regulation of public utility corporations is based.

 · But the fact that a business or enterprise is, generally speaking, a public utility does not make every service performed or rendered by those owning or operating it a public service, with its consequent duties and burdens, but they may act in a private capacity as distinguished from their public capacity, and in so doing are subject to the same rules as any other private person so acting. *Killam* v. *Norfolk etc. R. Co.,* 122 Va. 541, 96 S. E. 506, 6 A. L. R. 701. Since the basis of the right of regulation is that a duty is owed the public, regardless of contract, it follows as a corollary that when the duty which arises is based purely on contract and not on law, express or implied, the situation is governed by the rules applying to private contracts in general, notwithstanding that one of the parties may be operating a public utility.

 Was the service which the City of Phoenix rendered to plaintiffs and those in like situation with them, based upon contract or law? If it was based upon a legal right, regardless of contract, by all the decisions the courts may determine whether the terms on which he obtains this service are reasonable or not. On the other hand, if his right to receive service is based solely on a voluntary contract with the city, then that contract is subject to review by the courts only in the same manner as any other private contract, and it is not for them to determine whether its provisions are arbitrary, unreasonable or discriminatory.

There are many cases cited to us by counsel for both parties as bearing upon this question. So far as we are advised, the states of Pennsylvania and perhaps Kansas are the only ones holding that when a public service is rendered by a municipal corporation outside of its city limits, the courts may review the reasonableness of the rates charged for the service. In

the cases of *Shirk* v. *Lancaster City*, 313 Pa. 158, 169 Atl. 557, 90 A. L. R. 688, *American Aniline Products, Inc.*, v. *City of Lock Haven*, 288 Pa. 420, 135 Atl. 726, 50 A. L. R. 121, and *Barnes Laundry Co.* v. *City of Pittsburgh*, 266 Pa. 24, 109 Atl. 535, the Supreme Court of Pennsylvania did hold that the courts had a right to determine the reasonableness of charges made by certain municipal corporations. This was based on a specific statute which held that the several courts of common pleas shall have chancery powers to prevent or restrain "the commission or continuance of acts contrary to law and prejudicial to the interests of the community or the rights of individuals". 17 P. S. Pa. § 282; *Barnes Laundry Co.* v. *City of Pittsburgh*, *supra*. This case apparently is based upon the ground that the city enjoyed a monopoly of supply and was under the duty, as a matter of law, to furnish the water in question.

In the case of *American Aniline Products, Inc.*, v. *City of Lock Haven, supra,* the court seemingly bases its judgment on the fact that a city operating a legalized monopoly cannot make an unfair discrimination, and the same rule apparently was applied in *Shirk* v. *Lancaster City, supra.*

The case of *Holton Creamery Co.* v. *Brown*, 137 Kan. 418, 20 Pac. (2d) 503, deals with a situation where the consumer was a resident of the city. Under the Kansas statute, the court held that the rates charged by municipalities were subject to the same rule as those of a private public utility corporation, but in that case the consumer was a resident of the city and the municipality was, of course, under the duty of rendering him the services which he demanded.

The leading case upholding the position of the city is that of *Childs* v. *City of Columbia*, 87 S. C. 566, 70 S. E. 296, 297, 34 L. R. A. (N. S.) 542. In that case, as in this, the complainant was a nonresident of the

city, and the charges made him, originally on equal terms with the residents, were increased greatly and complaint was made that the proposed rate was excessive, unreasonable and discriminatory, while the relief asked was injunctive. The court said:

"Evidently the complaint is framed on the theory that the city of Columbia is to be considered, with respect to the contract alleged, as if it were a private business corporation, bound by any contract made by the city authorities to furnish water beyond the city limits. Counsel for appellant has submitted an elaborate argument supported by many authorities in support of that theory. Assuming the correctness of this position, it does not by any means follow that the city occupied towards the plaintiff, a nonresident, the relation of a public service corporation, under obligation to contract with him for his water supply at a reasonable rate, without discrimination.

"All powers and privileges conferred by the Constitution and statutes on municipal corporations must be held to be limited in their exercise to the territory embraced in the municipal boundaries, and for the benefit of the inhabitants of the municipality, unless the Constitution or statute expressly provides that such powers and privileges may be exercised beyond the corporate boundaries, or for the benefit of nonresidents. . . .

"Assuming that the city authorities had the power to contract with the plaintiff to furnish water for his residence and other houses, and that the duty devolves on them of contracting for the sale of any excess of the city's water supply beyond the municipal needs and the needs of its inhabitants, it is, nevertheless, perfectly obvious that the duty to sell the excess of its water supply did not import an obligation to make a contract with any particular person at a reasonable price; but, on the contrary, did import an obligation to sell its surplus water for the sole benefit of the city at the highest price obtainable. It was a duty not owed to outsiders, but exclusively to inhabitants and taxpayers of the city. *It follows that the plaintiff, as a mere nonresident, had no rights whatever against*

*the city, except such as he may have acquired by con-*
*tract. In other words, the city was under no public*
*duty to furnish water to the plaintiff at reasonable*
*rates, or to furnish it at all,* and to obtain the injunc-
tion the plaintiff must show that the city is about to
violate its contract with him.'' (Italics ours.)

In the case of *Collier* v. *City of Atlanta,* 178 Ga.
575, 173 S. E. 853, 855, it appeared that the City of
Atlanta, which had for many years operated a muni-
cipal water system for its own inhabitants, was author-
ized by the legislature to extend its system without
the limits of the city to such point as it saw fit. After
some time of service to outside consumers it raised
the water rates to such consumers beyond that of
similar consumers within the city. A protest was made
and the court, in its syllabus opinion, said:

''1. The city of Atlanta has authority under its
charter to extend its water mains beyond the city
limits and into the territory of the adjacent county
of De Kalb, and to supply persons in such outlying
territory with water service, and to charge persons for
such service as may be supplied to them on their re-
quest.

''(a) The charge for such service is not in any sense
a tax.

''(b) The city may not compel any person in such
outlying territory to accept the water service which it
undertakes to provide, nor may the city be compelled
to render water service to such person where it has
not voluntarily contracted to do so.

''(c) The city may, by ordinance in pursuance of
its charter powers, classify rates to be charged in
such outlying territory for service to be rendered
therein, and provide for cutting off water supply to
customers for failure to pay their bills.

''(d) The fact that rates are prescribed that are
higher than those fixed within the city limits will not
render the rates charged in such outlying territory
objectionable as offending the due process and equal
protection clauses of the State and Federal Constitu-

tions. (Const. Ga. art. 1, § 1, par. 3; Const. U. S. Amend. 14 [U. S. C. A.]) ''.

After a careful consideration of all the authorities, we are of the opinion that the controlling factors in the present case are that the city was under no obligation, as a matter of law, to furnish any service to the plaintiffs; that the relationship between them was purely contractual in its nature, and that such being the case, the reasonableness or unreasonableness of the rates fixed by the contract are not subject to review by the court. The only right which it has under the circumstances is to determine whether the city is complying with the terms of its contract, since there is no allegation that there was any fraud in its inception.

As we have stated in the *City of Phoenix* v. *Wright, supra,* the remedy of the outside consumer, in a case like this, is an appeal to the political authority, such as the legislature or the voters of the state, or a refusal to accept the service on the terms offered by the city.

The judgment of the superior court of Maricopa county is reversed, with instructions to vacate the temporary injunction and to sustain defendant's demurrer on the ground that the court did not have jurisdiction of the case.

ROSS, C. J., concurs.

McALISTER, J., Dissenting.—I am unable to concur in the judgment of my colleagues and will state briefly why.

It appears from the complaint that prior to the extension by the city of its water system to territory outside its corporate limits the plaintiffs and many others similarly situated were obtaining water from community water companies organized for the purpose of supplying water to those residing in various

areas adjacent to the city; that these plaintiffs and others similarly situated were approached by the city and induced by it to abandon their community water systems and connect with that of the city; that when this was done the city proceeded to purchase, dismantle and discard these community systems thereby creating a situation in which the city only could furnish residents of these areas domestic water and for practical purposes giving it a monopoly in this respect; that the contract the residents of these various areas were induced to enter into provided that the city would furnish for $2.50 a minimum of 1,666 cubic feet a month and fifteen cents for 100 cubic feet in excess thereof, and that the plaintiffs and others similarly situated have paid these charges; that on March 10, 1938, without the consent of or notice to the plaintiffs or any of the others similarly situated, the city raised the minimum water charge to $3.75 per month for practically the same service, that is, for 1,700 cubic feet, and twenty-two cents for each 100 cubic feet in excess thereof; that these increased rates are excessive, unreasonable and confiscatory, and, notwithstanding the city made no change in the rates of those residing within its corporate limits, it earned a net operating profit of not less than $250,000 in the year preceding the raise of these rates; that plaintiffs and others similarly situated are required to pay these increased and excessive charges or have their service discontinued.

The sufficiency of this complaint was questioned by defendant's motion to dismiss upon the ground that it appeared on its face that the court had no jurisdiction of the subject matter. This motion was, in effect, a demurrer and upon its soundness rests the correctness of the order granting a temporary injunction. However, in determining whether the court did

in fact have jurisdiction, the majority opinion refers to a matter not alleged in the complaint but set up in the answer as a special defense, that is, that the water was furnished plaintiffs under a provision of the contract under which the relationship of the parties arose stating that if it should be necessary at any time to revise the rates, those to be paid "shall be as fixed from time to time by the city commission." This was evidently adverted to upon the theory that a consideration of it is necessary to a complete disposition of the matter involved.

There is no question but that under the state Constitution the power to fix the rates water consumers residing outside (as well as inside) the corporate limits of the city must pay rests wholly in the municipality itself. My colleagues say, however, that since this is true and since the service rendered the plaintiffs and some other four thousand similarly situated is based upon a contractual and not a legal right, the city is not amenable to the courts or any other authority in the discharge of this function. I am unable to accept this view, for in furnishing water for domestic purposes the city is performing a public service whether those served live within or without its corporate limits. The fact that the city's boundary line separates these two classes of users does not change the character or nature of the service one iota. There is, in fact, no greater public service a utility, whether privately or municipally owned, can render than to supply people with water for domestic purposes, and the fact that the city furnishes this article of prime necessity in its proprietary rather than in its governmental capacity, or that it does so pursuant to a contract with its several thousand nonresident consumers, does not change the character of the service in the slightest degree. It is still a public service and the water plant with which it is rendered is

no less a public utility because it belongs to the city instead of some private individual or corporation, for while a utility owned by a municipality is sometimes classified as a "municipal utility" to distinguish it from a "public utility," *General Pipe Line Co.* v. *State Board of Equalization,* 5 Cal. (2d) 253, 54 Pac. (2d) 18, a municipal utility is nothing more than a public utility municipally owned and over which the rate-fixing body of the state, the corporation commission in Arizona, has no jurisdiction. So, in operating its own utility the city does not change its character to that of a private corporation but remains as much a municipal corporation rendering a public service as it is when performing a purely governmental function. In *City of Pasadena* v. *Railroad Com.,* 183 Cal. 526, 192 Pac. 25, 27, is found this language:

"It is not true that a city is a private corporation when carrying on a municipally owned public utility. No decision so holds. All the decisions on the subject recognize the fact that a city does not change its character by engaging in such enterprises. . . . The distinction does not go to its character as a corporation, but to its liabilities in exercising one class of its powers, as compared to its liabilities in the exercise of its functions as a local governmental agency."

Since the service the defendant renders its 4,000 nonresident consumers is public in the highest degree, I am unable to see how the fact that it is based upon a voluntary contract with the city makes the relationship between it and these users merely that which exists between two private individuals who have contracted about a matter not affected with a public interest, and especially is this true under the terms of the contract here involved. Undoubtedly the relationship between the parties originated in contract, for it could have arisen in no other way, since the city could not have compelled nonresidents to use its water,

nor could the city have been compelled to furnish water to them, even though it had constructed its system through the areas where these outside residents live. The rate the contract provides should be paid, without any limitation as to how long it should run, is $2.50 per month for 1,666 cubic feet and fifteen cents for each 100 cubic feet in excess thereof, but the higher rate so strenuously objected to by the plaintiffs and others was fixed by the city commission some years later pursuant to the provision of the contract giving it this authority. In agreeing that the city could revise the rate that was acceptable to both parties to begin with, the plaintiffs and the defendant both evidently acted upon the theory that any charge the city might fix pursuant thereto in the future would not be unreasonable, excessive or discriminatory but reasonable and fair. Clearly this was the meaning both parties intended this provision to have, for when the power to fix a rate any public utility may charge for water for domestic purposes is given to any body, board or commission, it always implies that the rate fixed pursuant thereto shall be reasonable and neither excessive nor discriminatory.

"When a constitution or statute provides for the fixing of rates or compensation," to use the language of 27 R. C. L. 1443, "it means reasonable rates and just compensation. So a board or other body to which rate making power is delegated has no right to fix rates arbitrarily and without investigation, or without exercising its judgment or discretion to determine what is a fair and reasonable compensation."

And this is just as true of a municipal corporation in fixing the rates to be charged for domestic water furnished by it pursuant to its constitutional power, as it is of any other regulating body in fixing rates for a privately owned water plant, and certainly the city cannot in its proprietary capacity take to itself by contract

any greater power or right to fix water rates than the Constitution itself gives it. The following pertinent statement is also from 27 R. C. L. 1443:

"A municipality operating its own water system is subject to the same duties and obligations and responsibilities of an individual or private corporation, running and operating a like business, and is subject to have the rates charged, regulated, and fixed in the same manner prescribed by law for the fixing of water rates generally."

In 43 C. J. 421, section 552, appears the following statement concerning the power of a municipal corporation to fix rates:

"It may change the rates from time to time as the circumstances demand it. The rates cannot be discriminatory. They must be reasonable; and they are subject to review by the courts in the same manner as the rates fixed for public utilities privately owned."

See, also, *Holton Creamery Co.* v. *Brown*, 137 Kan. 418, 20 Pac. (2d) 503; *Feil* v. *City of Coeur D'Alene*, 23 Idaho 32, 129 Pac. 643, 43 L. R. A. (N. S.) 1095; *Twitchell* v. *City of Spokane*, 55 Wash. 86, 104 Pac. 150, 133 Am. St. Rep. 1021, 24 L. R. A. (N. S.) 290; 67 C. J. 1242, sec. 796; *Barnes Laundry Co.* v. *City of Pittsburgh*, 266 Pa. 24, 109 Atl. 535; *Central Iron & Steel Co.* v. *City of Harrisburg*, 271 Pa. 340, 114 Atl. 258; *American Aniline Products, Inc.*, v. *City of Lock Haven*, 288 Pa. 420, 135 Atl. 726, 50 A. L. R. 121.

Hence, as I see it, all the provision of the contract authorizing the city to fix rates from time to time accomplishes is to place the city and its nonresident consumers in the same relation towards each other as to future rates that exist between the municipality and its resident consumers, that is, the rates in both instances must be reasonable, though not necessarily the same, because it is plain that certain factors might enter into the question of reasonableness in the case of

nonresidents that would not be present where residents only are concerned. If this is not the correct construction of this provision, the city may fix any rate it sees fit, however unreasonable, excessive or exorbitant, and the plaintiffs and the other four thousand nonresident users will be compelled to pay it or suffer discontinuance of their service. And this is true, notwithstanding the fact that the community systems from which they previously secured their water were acquired, dismantled and discarded by the city after the contract was entered into, thus rendering it impossible for them, except at great expense, to obtain water elsewhere. This is in effect the interpretation contended for by the defendant and, if I understand it correctly, the one upheld by the majority opinion, but it seems clear to me that this provision, when given this construction, is illegal and unenforceable, since the rates the city may fix pursuant to its constitutional power must be reasonable and neither excessive nor discriminatory. 67 C. J. 1245, sec. 803. The right to fix rates for domestic water or any other product of a public utility is derived from the police power of the state and must be exercised in a way to promote the public welfare, but if a municipality or any other owner of a public utility may compel the users of the domestic water it furnishes to pay an excessive or exorbitant price for it, it is difficult to see how this result is accomplished. It can be done only by adhering to the principle expressed in the following language of the court in *Shirk* v. *Lancaster City*, 313 Pa. 158, 169 Atl. 557, 561, 90 A. L. R. 688:

"The fundamentals of municipal ownership of a water plant are common convenience, efficiency, quality, and low cost of the commodity to the consumer. Water, like air, is a necessity of life, and, from a municipally owned plant, in theory at least, should

come to the consumer without profit to the seller as such term is understood in the utility field, but such theory does not exclude the idea of profit, as we have recognized in our decisions.

" . . .

"Municipal authorities, if they determine to make a profit, and that matter is solely within their control, should bear in mind that municipal ownership implies the furnishing of water at the lowest cost possible, consistent with efficiency, service, quality of the commodity, and the preservation of the plant; . . . "

The statement in *Childs* v. *City of Columbia* and *Collier* v. *City of Atlanta,* cited in the majority opinion, that in selling its surplus water to outside residents the city is under no obligation to do this at a reasonable rate but should get all the profit it can for itself, is clearly a departure from this principle.

Whether the rates complained of are in fact unreasonable, excessive and discriminatory, I do not know, but the complaint alleges they are and, in passing upon the correctness of the order denying the motion to dismiss because it appears on the face thereof that the court had no jurisdiction of the subject matter, this allegation must be treated as true.

The fact that the corporation commission has no jurisdiction over rates fixed by the city, whether for residents or nonresidents, instead of indicating that the courts have no power to review rates fixed by it for outside users, tends to strengthen the view that they may at the suit of nonresidents entertain a complaint that a rate fixed by the city is excessive and discriminatory. Admittedly they could take such action upon a similar complaint by resident users, and there is certainly no presumption that these are entitled to protection against excessive and exorbitant rates but that outside consumers are not.

Inasmuch, therefore, as the provision of the contract empowering the city to revise rates, authorizes it to

fix a reasonable nondiscriminatory charge for its nonresident users and nothing higher, it follows necessarily that the courts in the exercise of their equity powers may review such rates at the suit of consumers and enjoin their enforcement when it is shown at a hearing that they are in fact unreasonable, excessive and discriminatory. 67 C. J. 1243. They have no power to fix the rates the city may charge but are limited in jurisdiction to reviewing those fixed by it and to the granting of relief from them if found excessive or confiscatory.

The order of the trial court should be affirmed.